UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

REPORT AND RECOMMENDATION

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Mary C. Strom,

                    Plaintiff,

    vs.

Michael J. Astrue,
Commissioner of Social
Security,

                    Defendant.              Civ. No. 07-150 (DWF/RLE)

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied her application for Disability Insurance

Benefits ("DIB").  The matter is now before the Court upon the parties' cross-

Motions for Summary Judgment.  The Plaintiff has appeared by Fay E. Fishman, Esq.,

and the Defendant has appeared by Lonnie F. Bryan, Assistant United States

Attorney.  For reasons which follow, we recommend that the Plaintiff's Motion for

Summary Judgment be denied, that the Defendant's Motion be denied, and that this matter be remanded to the Commissioner for further proceedings, in accordance with this Report.

## II. Procedural History

The Plaintiff first applied for DIB on January 14, 2004, at which time, she alleged that she had become disabled on March 30, 2002. [T. 62]. The Plaintiff met the insured status requirement at the amended onset date of disability, and remains insured for DIB through March of 2008. [T. 65].

The State Agency denied her claim on initial review, and upon reconsideration. [T. 36-44]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on July 5, 2006, a Hearing was conducted, at which time, the Plaintiff appeared, and was represented by counsel. [T. 544-89]. Thereafter, on August 25, 2006, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 15-27]. On August 30, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 10], which, on November 22, 2006, denied the request for further review. [T. 7-9]. Thus, the ALJ's determination became the final decision of the Commissioner. Grissom v. Barnhart,

416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.  Factual Background.  The Plaintiff was almost fifty (50) years old at the time of the Hearing.  [T. 62].  She is left handed [T. 145], and has a college degree, [T. 119], with past relevant work as a director of communications, communications manager, and in child care. [T. 161].  The Plaintiff last worked in 2002  for American Medical Systems, Inc., as a director of communications.  [T. 66-67; 71-72; 122].  The Plaintiff alleges that she cannot work due to fibromyalgia, depression, migraines, and arthritis.  [T. 113].

1.  Medical Records.  In February of 2002, the Plaintiff had a check-up and reported being in no acute distress, and was recommended to try a vitamin, and an exercise regimen, for her restless leg syndrome.  [T. 373-74].

In June of 2002, the Plaintiff was seen by Dr. Jeff Sczublewski for pain in her upper back and neck, which had been increasing in the past few weeks.  [T. 361]. The Plaintiff reported the pain, at the time of that examination, as 1-5/10, and an examination revealed no abnormalities.  Id.  The Plaintiff stated that she was also seeing a chiropractor, and was planning to take the summer off of work to get control

of her health issues and pain.  Id.  The Plaintiff was walking two and a half (2.5) miles a week, was referred to physical therapy and counseling, and was placed on Wellbutrin for depression.[1]  [T. 362].

In July of 2002, the Plaintiff returned to Dr. Sczublewski for increasing left-sided neck pain, which was constant, dull and achy, and radiated into her arm.  [T. 355].  She reported that she was exercising for thirty (30) to forty (40) minutes daily, and that she experienced occasional low back pain.  Id.  On examination, Dr. Sczublewski found no abnormalities, and ordered an MRI of the Plaintiff's neck.  [T. 356-57].  The MRI showed a C5-6 posterior disc herniation with mild spinal cord compression.  [T. 366].

The Plaintiff reported left arm numbness in August of 2002, and an EMG was performed, with normal results.  [T. 347].  Later in that month, the Plaintiff began trigger point injections with Dr. Ramon Sotto, [T. 354], and two (2) weeks later, she reported that her pain was forty (40) to sixty (60) percent improved.  [T. 358].  On that examination, the Plaintiff received additional injections in her neck and shoulders.  Id.

---

[1]Wellbutrin "is indicated for the treatment of major depressive disorder." Physician's Desk Reference, p. 1617 (62nd ed. 2008).

The Plaintiff reported, in September of 2002, that the trigger point injections had helped, and that she was using a TENS unit, taking Flexeril, and was in physical therapy.[2]   [T. 371-72].   The Plaintiff also reported that, although she had ceased taking Wellbutrin, as it had been causing anxiety and stress, she was becoming depressed and tearful, and wanted to resume anti-depressants.   Id.   The Plaintiff was prescribed Paxil,[3] and her treatment options were reviewed.   Id.   The Plaintiff received additional trigger point injections in September of 2002, and one (1) week later, she told Dr. Sotto that her pain was seventy-five (75) to eighty (80) percent improved.   [T. 348; 370].

In October of 2002, the Plaintiff reported to Dr. Sczublewski that, while the trigger point injections and physical therapy had improved her left arm and upper back, her arms felt shaky, and she had fallen on her stairs, which exacerbated her pain, as did an extended car trip to International Falls.   [T. 345-46].   Dr. Sczublewski increased the Plaintiff's dose of Paxil and, on examination, found tenderness in the

---

[2]Flexeril is a trademark for a preparation of cyclobenzaprine hydrochloride, which is "a compound structurally related to the tricyclic antidepressants, used as a muscle relaxant." Dorland's Illustrated Medical Dictionary, at pp. 443, 685 (29th Ed. 2000).

[3]Paxil is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, p. 1531 (62nd ed. 2008).

Plaintiff's upper back and elbows.  Id.  The Plaintiff was prescribed additional physical therapy, given injections for her arms, and told to continue stretching and exercising, and taking Flexeril.  Id.

The Plaintiff began care with Dr. Patricia Harper, who is a psychiatrist, in November of 2002.  [T. 339-40].  The Plaintiff reported that she had left a stressful workplace, where she had been harassed and stalked, and had residual problems from that environment, and additionally, she stated that she was starting a freelance business, but was sleeping excessively, had memory problems and anxiety, and felt sad.  Id.  The Plaintiff also complained that the medications for restless leg syndrome made her sleepy, and reported that her anti-depressants were either ineffective or caused side-effects.  Id.  According to the Plaintiff, her mood was negatively affected by her pain, and Dr. Harper noted that the Plaintiff exhibited a blunt affect, and appeared fatigued.  Id.  Dr. Harper diagnosed the Plaintiff with major depressive disorder, assigned her a GAF[4] of 55, and prescribed Effexor.[5]  Id.

---

[4]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social,

The Plaintiff was seen by Dr. Sotto in December of 2002, and at that time, she told him that the injections and physical therapy continued to help the pain in her neck and back, which no longer hurt, although she reported pain in her shoulder, and stated that her shoulder and neck muscles felt stiff and tired.  [T. 350-51].  The Plaintiff also reported bilateral arm pain, stiffness and fatigue after she had started doing more computer work, and she also claimed numbness in her left index finger. Id.  On examination, Dr. Sotto found that the Plaintiff had tight and tender shoulders and upper arms, with trigger points, and slightly decreased sensation in her left finger. Id.  Dr. Sotto administered trigger point injections, and instructed the Plaintiff to use heat and exercise, and he gave her a prescription for a sequential muscle stimulator. Id.

In January of 2003, the Plaintiff underwent several sessions of trigger point injections in her shoulders and arms. [T. 331; 338; 349].  The Plaintiff reported to Dr. Sczublewski that she had eighty (80) percent improvement in her neck and shoulders, and was undergoing therapy for her arms.  [T. 343-44].  She reported moderate pain

occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

[5]Effexor is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, p. 3359 (62nd ed. 2008).

from a flare up in October of 2003, with nerve tingling sensations for ten (10) to twenty (20) minutes after walking, and had pain and muscle twitching in her left buttock.  Id.  The Plaintiff was prescribed amitriptyline[6] for the numbness, and was referred to neurology and rheumatology.  Id.

In January of 2003, the Plaintiff told Dr. Harper that her medication helped with her tendency to worry, but that she had problems with her concentration and memory.  [T. 336-37].  The Plaintiff reported feeling anxiety about returning to work after freelancing, and expressed concern that the stress of working would increase her physical symptoms.  Id.  Dr. Harper found that the Plaintiff had a flat affect, and seemed anxious and sad, and referred the Plaintiff to counseling and increased her dosage of Effexor.  Id.

Also in January of 2003, the Plaintiff saw Dr. John Worley, who is a neurologist, and reported that she had felt better over the past week, possibly as a result of the amitriptyline, trigger point injections, and biofeedback.  [T. 334].  The Plaintiff reported continued tingling in her arms, and tremors in her hands when she was anxious, and denied any bowel or bladder problems.  Id.  On examination, the

_____

[6]Amitriptyline hydrochloride is "a tricyclic antidepressant ** * used in the treatment of enuresis, chronic pain, peptic ulcer, and bulimia." Dorland's Illustrated Medical Dictionary, at p. 63 (29th Ed. 2000).

Plaintiff presented a postural tremor of her hands, with no tremor at rest, and a postural tremor of her feet.  [T. 335].  The Plaintiff was diagnosed with myofacial pain syndrome and an essential tremor, which was mild and did not require medication.  Id.

In February of 2003, the Plaintiff underwent further trigger point injections. [T. 329-330].  The Plaintiff told Dr. John Schousboe, who is a rheumatologist, that her problems had increased with her prior work situation, and that she continued to have pain in her arms, thighs and buttocks, did not sleep well, and was depressed and anxious. [T. 326].  The Plaintiff reported irritability from the Effexor, and occasional abdominal cramping with diarrhea. [T. 327].  On examination, Dr. Schousboe found that the Plaintiff had Raynaud's symptoms in her lips and fingertips, slight hair thinning, and an intermittent rash on her neck and chest wall, which was tender to the touch.  Id.  The Plaintiff also exhibited 13/18 positive tender points of fibromyalgia, and tension was noted in the muscles of the base of her skull and neck.  [T. 332-33]. Dr. Schousboe diagnosed the Plaintiff with fibromyalgia, suggested relaxation training, and instructed her to take the prescribed medication for restless leg syndrome nightly.  Id.

The Plaintiff reported continued depression during an examination by Dr. Harper in March of 2003, and her dose of Effexor was increased. [T. 324-25]. Dr. Harper told the Plaintiff that her fibromyalgia might not allow her to return to her prior level of energy. [T. 324-25]. In April of 2003, the Plaintiff repeated her complaints that Effexor caused side-effects, which had subsided. [T. 322-23]. The Plaintiff reported that she was excited by the prospect of going to work for Medtronic, and Dr. Harper noted that the Plaintiff's mental status had improved, and that her depression was nearly in full remission. Id.

In May of 2003, the Plaintiff told Dr. Sczublewski that her physical condition had improved overall, although she still had pain in her neck, upper back, and left arm. [T. 318-21]. The Plaintiff reported that she was more active, able to get more exercise, and was experiencing less pain, although she complained that sitting at her computer for more than an hour caused pain and fatigue, and that she required a lot of sleep. Id. The Plaintiff also complained of frequent nighttime urination from her medication, which interfered with her sleep. Id. According to the Plaintiff, she was drastically improved from her condition of a year previously, but was frustrated by her persistent pain, although she also reported that her depression was improved. Id.

Dr. Sczublewski recommended that the Plaintiff continue her exercise and relaxation techniques, and discontinued the medication for restless leg syndrome.  Id.

The Plaintiff saw Dr. Sotto in June of 2003, and at that time, she reported that she was eighty-five (85) to ninety (90) percent improved, and no longer experienced muscle spasms, although her left-sided neck and shoulder pain ranged from 1-4/10 and was sharp and stabbing, exacerbated by tension, stress, computer work, and travel, and relieved by exercise, walking, heat and ice. [T. 316-17].  On examination, the Plaintiff presented with tight, tender trigger points in her left neck and shoulder regions, was referred to a pain clinic, and was told to continue her exercises and relaxation work.  Id.   In May of 2003, Dr. Sczublewski noted that the Plaintiff continued to improve, and that she was much more active than she had been a year before.  [T. 318-19].

In August of 2003, Dr. Harper discontinued the Plaintiff's prescription for Wellbutrin, noting that she was in nearly full remission from her depression and displayed no memory deficits. [T. 311].  After seven (7) sessions of chiropractic care in August of 2003, the Plaintiff reported that she hardly noticed her pain any more, and was thinking more rationally.  [T. 407-08].  However, at the end of August of 2003, the Plaintiff reported to Dr. Sczublewski that her left buttock pain, increased

sleep, restless leg syndrome, and fibromyalgia, had worsened since she quit taking Wellbutrin. [T. 307-10]. Dr. Sczublewski noted that the Plaintiff was moderately depressed and had a flat affect, restarted her on Wellbutrin, increased her restless leg syndrome medications, and instructed her to follow up with her other doctors. Id.

An MRI of the Plaintiff's back, which was taken in September of 2003, revealed a mild disc bulge at L4-5, and mild degenerative arthritis. [T. 367]. X-rays of the Plaintiff's hips, which were taken at the same time, disclosed sacralization of the last lumbar segment, [T. 363], while x-rays of her back showed a sacralized transversed process, mild narrowing of disc space between L3-4, with mild arthritic changes of the bilateral facet joints. [T. 305].

In December of 2003, the Plaintiff saw Dr. Sczublewki for a flare up in her pain, and reported that she felt that she was completely disabled, and was seeing a chronic pain specialist and a psychiatrist. [T. 368-70]. The Plaintiff complained of migraine headaches, which were managed by non-prescription medications, poor sleep, increased emotional lability and depression, which she attributed to increased pain in her shoulders, neck and head. Id. The Plaintiff also stated that her pain and poor stamina had impacted upon her ability to interact with her family and maintain employment. Id.

- 12 -

The Plaintiff saw Dr. Steven Lebow in November of 2003, and reported that she had suffered from increasing headaches over the past two (2) months, which were improving with acupuncture. [T. 223-24]. On examination, the Plaintiff appeared anxious and quiet, and her neurological examination was normal, id., as was an MRI of her brain. [T. 227].

In December of 2003 the Plaintiff saw Dr. Karla Stormo for counseling, and reported that she was struggling to manage her pain, although a fibromyalgia support group was helpful. [T. 295-96]. Dr. Stormo noted that the Plaintiff appeared to be struggling with a number of major stresses, and appeared depressed. Id. Later in December of 2003, the Plaintiff saw Dr. Lebow, and reported that her headaches were better. [T. 221]. An examination found no abnormalities, and Dr. Lebow referred the Plaintiff to the Fibromyalgia Clinic at Abbott Hospital. Id.

In January of 2004, a clinician completed a Fibromyalgia Nursing Assessment, and noted that the Plaintiff complained of widespread muscle pain, significant sleep disturbance, and very significant memory and concentration problems, which impaired her ability to work. [T. 184-86]. Also in January of 2004, the Plaintiff saw Dr. Lebow and reported that her pain had been 11/10, but had decreased to 7/10 on her current regime of medications. [T. 220]. She complained of poor memory and

appeared depressed, and on examination, was found to have spasm in her trapezius and rhomboid.  Id.  The Plaintiff was prescribed Neurontin.[7]  Id.  The Plaintiff was also referred to occupational therapy and to physical therapy, but did not complete the program.  [T. 177].

The Plaintiff had several counseling sessions with Dr. Stormo in January of 2004, and appeared tearful and depressed.  [T. 297].  Dr. Stormo noted that the Plaintiff was late to one (1) session, and observed that tardiness had become a pattern for her.  [T. 298].  Dr. Stormo diagnosed the Plaintiff with chronic pain disorder, major depressive disorder, and fibromyalgia.  [T. 298-300].

The Plaintiff saw Dr. Lebow in February of 2004, and complained that the Neurontin was not helpful in treating her pain.  [T. 219].  Dr. Lebow noted that the Plaintiff was anxious and depressed and, since he felt that she needed more comprehensive pain management than he could offer, he referred her to the Fairview Hospital Pain Clinic.  Id.

Dr. Harper saw the Plaintiff in March of 2004, and noted that, although she was alert and well-oriented, she displayed some difficulty with memory, and had

---

[7]Neurontin is "indicated for the management of postherpetic neuralgia in adults." Physician's Desk Reference, p. 2463 (62nd ed. 2008).

unrealistic goals for herself.   [T. 293-94].   In April of 2004, the Plaintiff was evaluated at the pain program at Fairview Hospital, and was diagnosed with fibromyalgia, somatoform disorder, left lumbar radiculopathy, depression and anxiety, and chronic pain syndrome.   [T. 191-95].   The examining physician, Dr. Miles Belgrade, noted that the Plaintiff had undergone a number of treatments for her pain, and had beneficial results from water therapy and acupuncture.   [T. 191].   The Plaintiff described negative reactions to several pain killers, but stated that Xanax[8] "worked great," reduced her pain and improved her function, with no negative side-effects.   [T. 192].

On examination, the Plaintiff's gait was normal, with full motor power in all major muscle groups, and symmetrical deep tendon reflexes, although she exhibited some loss of sensation on the left side.   [T. 194].   Dr. Belgrade recommended that the Plaintiff enter a pain management program, which would include physical reconditioning.   [T. 194-95].   Also in March of 2004, the Plaintiff underwent a psychological evaluation at Fairview Hospital, and was diagnosed with a pain

---

[8]Xanax is a trademark for a preparation of alprazolam, which is "a benzodiazepine used as an anxiolytic in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms."   Dorland's Illustrated Medical Dictionary, at pp. 54, 1990 (29th Ed. 2000).

disorder, with medical and psychological factors, and a major depressive disorder.
[T. 199].   The Plaintiff reported that her sleep disturbance was helped with
Trazodone,[9] and that her energy level had improved on Effexor, and additionally she
reported that she managed self-care and performed limited housework, and
maintained contact with others despite her symptoms. [T. 197-99]. The Plaintiff's
GAF was assessed at 45-50, and the treating physician opined that she would benefit
from a comprehensive pain program, including biofeedback. [T. 199].

In May of 2004, the Plaintiff told Dr. Harper that she had discontinued
Wellbutrin because of negative side-effects, and had decreased her dosage of Effexor
to save money. [T. 291-92]. The Plaintiff additionally reported that her fibromyalgia
was better, and that she had an improved mental status. Id.

After the Plaintiff complained of headaches in August of 2004, Dr. Lebow
prescribed Topomax,[10] and referred the Plaintiff to the pain clinic at Abbott Hospital.
[T. 216, 218]. Also in August of 2004, Dr. Harper examined the Plaintiff, and opined

---

[9]Trazadone hydrochloride is "an antidepressant used to treat major depressive episodes with or without prominent anxiety," that is also used in the treatment of chronic pain. Dorland's Illustrated Medical Dictionary, at p. 1868 (29th Ed. 2000).

[10]Topomax is "indicated for adults for the prophylaxis of migraine headache." Physician's Desk Reference, p. 2380 (62nd ed. 2008).

that she would probably not be able to return to her past work, because she could not tolerate a high pressured position, or fully alleviate her depression or fatigue, due to her fibromyalgia.  [T. 282-83].

On examination by Dr. William Lundberg, in October of 2004, the Plaintiff exhibited tenderness in her shoulders and hips, and the bottoms of her feet, and was diagnosed with chronic pain syndrome, fibromyalgia, bilateral plantar fascitis, greater trochanteric bursitis, tennis elbow, and shoulder impingement.  [T. 256].  Dr. Lundberg noted that the Plaintiff had no bowel complaints, and a normal gait with intact strength and sensation.  Id.  Dr. Lundberg suggested physical therapy and gave the Plaintiff heel cups.  [T. 257].

In November of 2004, Dr. Sczublewski encouraged the Plaintiff to engage in regular exercise to help her symptoms, and increased her dosage of Celebrex.[11]  [T. 268].

---

[11]Celebrex is "indicated for relief of the signs and symptoms of osteoarthritis, * * * rheumatoid arthritis in adults, * * * and for the management of acute pain in adults."  Physician's Desk Reference, p. 3066 (62nd ed. 2008).

- 17 -

In March of 2005, the Plaintiff saw Dr. Michael Wolfson, who diagnosed her with cervical radiculopathy, and started her on Prednisone.[12]   [T. 507-08].   Dr. Wolfson noted that the Plaintiff exhibited every imaginable symptom of menopause. Id.   Also in March of 2005, the Plaintiff saw Dr. Benjamin Pease, and reported that most of her pain was gone, in response to the Prednisone, and that she felt as though she had her life back.  [T. 504-06].   Examination showed mild tenderness in her neck and upper back, and a CT showed herniation at several points on her spine, and a bulging disc at C7-T1.  [T. 543].   Later in March of 2005, the Plaintiff was examined and found to have mild tenderness in her left wrist, and was diagnosed with cervical spondylosis and stenosis.   [T. 501-03].   Although the Plaintiff benefitted from Prednisone, she could not continue taking it for medical reasons, and the physician's assistant, who conducted the examination, recommended an ergonomic work station, and neck strengthening exercises.  [T. 502].

In April of 2005, the Plaintiff saw Dr. Richard Veyna for a surgical evaluation of her neck pain.  [T. 495-96].   Dr. Veyna noted that the Plaintiff's changes were mild and diffuse, and recommended a pain clinic, as he did not believe that surgery would

---

[12]Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an anti-inflammatory and immunosuppressant in a wide variety of disorders."  Dorland's Illustrated Medical Dictionary, at p. 1450 (29th Ed. 2000).

be effective.  Id.  Also in April of 2005, Dr. Wolfson prescribed atenolol[13] for the

Plaintiff's complaints of migraines.  [T. 491].  The Plaintiff followed up with Dr.

Wolfson, in May of 2005, and reported that atenolol increased her depression, and on

examination, Dr. Wolfson concluded that the Plaintiff's neck pain was related to her

cervical problems, and to her migraines.  [T. 489-90].  Dr. Wolfson discontinued the

atenolol and referred the Plaintiff to neurology, and encouraged her to exercise on a

regular basis.  [T. 489-90].

    In June of 2005, the Plaintiff saw Dr. Donald Dame, and complained of

continuing dull pain.  [T. 537].  On examination, Dr. Dame found signs of joint

dysfunction and tenderness to palpitation, and made no changes in the Plaintiff's

treatment plan.  Id.  Also in June of 2005, the Plaintiff saw Dr. Bergman, who noted

that he felt that the Plaintiff was a candidate for anterior cervical discectomy, but

wanted to try injections before surgery.  [T. 399-402].  The Plaintiff was not using

any pain medications at the time that she saw Dr. Bergman, and she stated that those

medications did not help her.  [T. 400].  Dr. Bergman further noted that the Plaintiff's

symptoms "continue to be very vague," [T. 397], and that, when the Plaintiff filled

---

[13]Atenolol is "used in the treatment of hypertension and chronic angina pectoris."  Dorland's Illustrated Medical Dictionary, at p. 166 (29th Ed. 2000).

out the "Review of Symptoms" form, she "checked almost every symptom possible." Id. The Plaintiff underwent an injection the next day, which reduced her neck pain by half. [T. 403, 487]. Dr. Bergman changed the Plaintiff's depression medication to Cymbalta.[14] [T. 487].

In August of 2005, the Plaintiff saw Dr. Wolfson, who diagnosed her with chronic pain syndrome, with "considerable psychosocial involvement." [T. 485-86]. In September of 2005, the Plaintiff saw Dr. Bergman, and stated that her relief from the injection was short-lived, and her pain continued. [T. 395]. Dr. Bergman opined that her pain was from fibromyalgia, and would not be helped by surgery, and recommended a pain clinic. [T. 396]. In October of 2005, the Plaintiff was seen by Dr. Stormo, and reported that she was exercising regularly, but continued to have difficulty sitting for long periods of time. [T. 445-46].

In November of 2005, the Plaintiff stated that she exercised daily, but complained of chronic neck and upper back pain, headaches, numbness and tingling in her left arm, fatigue, depression, fibromyalgia, hip bursitis and plantar fascitis, with constant pain that she rated as 3/10. [T. 477-78]. On examination, the Plaintiff

---

[14]Cymbalta is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, p. 1793 (62nd ed. 2008).

exhibited tight tender neck muscles, and the clinician noted that an MRI, which was performed in March of 2005, disclosed that the cervical spinal cord was intrinsically unremarkable.  Id.

In December of 2005, the Plaintiff reported that Cymbalta was helping her depression and sleep, and she was diagnosed with recurrent major depression, moderate attention-deficit disorder traits, with difficulty concentrating and focusing, although her short- and long-term memory were grossly intact, and she was assigned a GAF of 65.  [T. 468-69].  The Plaintiff's Cymbalta was increased, and she was given a prescription for Ritalin.[15]  Id.  On examination by Dr. Belgrade in December of 2005, the Plaintiff exhibited mild to moderate tenderness in her neck, shoulder and legs, and was given a diagnosis of fibromyalgia and multiple somatic symptoms, which were contributed to by emotional distress and bottling up emotions.  [T. 415-17].   Dr. Belgrade recommended therapeutically expressing emotions, and participation in a pain management program.  Id.  In an examination by Dr. Bruce

---

[15]Ritalin is a trademark for preparations of methylphenidate hydrochloride, which is "a central stimulant used in the treatment of attention-deficit/hyperactivity disorder, various types of depression, and narcolepsy." Dorland's Illustrated Medical Dictionary, at pp. 1105, 1582 (29th Ed. 2000).

Meyer in December of 2005, the Plaintiff was assigned a GAF of 65, with her highest GAF in past years noted to have been a 75. [T. 468-69].

2. <u>Evaluations</u>. In May of 2004, a State Agency physician reviewed portions of the Plaintiff's medical records, and concluded that her psychological problems caused her to be moderately limited in her ability to do detailed job instructions, maintain attention and concentration for extended periods, work with or near others without being distracted by them, and interact appropriately with the public. [T. 210-14]. A second State Agency physician stated that the Plaintiff was limited to light work of lifting twenty (20) pounds occasionally, and ten (10) pounds frequently, and sitting, standing, or walking for six (6) hours in an eight (8) hour day. [T. 229-236].

In July of 2004, the Plaintiff underwent a Social Security psychological consultative examination with Dr. Carole Selin. [T. 201-08]. Dr. Selin found that the Plaintiff showed adequate insight and a detailed memory of events, and had an appropriate affect. [T. 205-06]. The Plaintiff reported activities of daily living that included riding a bicycle with her children, gardening with a bench, driving a car, and cooking, on occasion, for her family. [T. 205]. The Plaintiff's general memory tested as average for her age, and the Plaintiff was assigned a GAF of 60. [T. 207-08]. Dr.

Selin concluded that the Plaintiff might have difficulty tolerating stress in a workplace, due to her depression, and that her anxiety might cause difficulty with job tasks requiring sustained contact with people, but she stated that the Plaintiff could tolerate brief contact with coworkers and supervisors.  [T. 208].

In August of 2004, Dr. Dan Larson produced a "Mental Residual Functional Capacity" letter, in which he stated that he had examined the Plaintiff, and found that she could tolerate brief contact, and had adequate concentration, and that she retained the ability to concentrate on, and complete, routine and repetitive tasks, which she could carry out with adequate persistence and pace.  [T. 214].

In September of 2004, Dr. Lebow drafted a letter in which he stated that, due to her chronic pain, the Plaintiff was not able to work, and that she required a chronic pain clinic.  [T. 215].

In January of 2005, Dr. Sczublewski completed an assessment of the Plaintiff's mental health functioning.  [T. 386-88; 389-94].  Dr. Sczublewski rated the Plaintiff's ability to cope with work stress, or to function independently, as "poor to none," he stated that the Plaintiff had poor memory retention and concentration, and fatigue, and concluded that the Plaintiff would be absent for more than three (3) times per month.  [T. 386-88].   At the same time, Dr. Sczublewski also filled out a

"Fibromyalgia Residual Functional Capacity Questionnaire," in which he stated that the Plaintiff's progress was poor, and that her pain was sufficiently severe to interfere with her attention and concentration on a "constant basis." [T. 389-94]. Dr. Sczublewski felt that the Plaintiff would be incapable of even low stress work. [T. 391].

In March of 2006, Dr. Stormo completed a "Medical Assessment of Ability To Do Work-Related Activities (Mental)" for the Plaintiff, and noted that the Plaintiff was talkative, and easily distracted in sessions, and that, while the Plaintiff had improved on medication for attention deficit disorder, she continued to "tune out," and made mistakes performing household tasks. [T. 523-25]. Dr. Stormo noted that the Plaintiff suffered from panic, and could not handle stress, and expressed the view that the Plaintiff would be absent from work approximately three (3) times each month. [T. 525].

Also in March of 2006, Dr. Amy Stenehjem-Kelsch completed a "Fibromyalgia Residual Functional Capacity Questionnaire" for the Plaintiff, and stated that emotional factors contributed to the severity of the Plaintiff's symptoms, which were severe enough to interfere with her attention and concentration on a frequent basis. [T. 419-24]. Dr. Stenehjem-Kelsch stated that the Plaintiff could not perform low-

stress work, limited her to sitting ten (10) to fifteen (15) minutes, and standing for ten (10) minutes at a time, and stated that the Plaintiff would miss work more than four (4) times a month.  [T. 422-24].

B.   Hearing Testimony.  The Hearing on July 5, 2006, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record.  [T. 546].  The ALJ asked the Plaintiff's attorney if she had any objections to the evidence being introduced into the Record, and the Plaintiff's attorney stated that she did not.  [T. 547].  The ALJ then summarized the Plaintiff's claim.  [T. 547-48].  As noted by the ALJ, the Plaintiff filed her application in 2004, asserting that she was disabled at least by March 30, 2002, when she was approximately forty-five (45) years of age, and that her claim was denied.  [T. 547].  Next, the ALJ asked the Plaintiff's counsel if she had any opening comments.  [T. 548].

The Plaintiff's attorney began by stating that the Plaintiff suffered from a combination of impairments, including fibromyalgia, back and neck pain, somatoform disorder, and depression and anxiety.  Id.  As noted by the Plaintiff's counsel, the Plaintiff had no financial incentive to seek DIB since, in her working career she had earned a large salary.  Id.

- 25 -

The ALJ then swore the Plaintiff to testify, and began his questions by asking her if she was left- or right-handed. [T. 549]. The Plaintiff replied that she was left-handed, and further explained that she was five (5) feet, three (3) inches tall, and weighed 175 pounds. Id. The ALJ asked the Plaintiff about her home life, and the Plaintiff stated that she was married, and that, since July 1, 2006, her spouse had been self-employed as the owner of a transmission business. Id. The Plaintiff explained that she had hoped to assist her husband in his business, but had been unable to participate because of her health problems, including fatigue and pain, which rendered her unreliable. [T. 549-51].

The ALJ asked the Plaintiff about evidence in the Record that suggested that she "generate[d] many obstacles to [her] own success," and the Plaintiff replied that she felt that her body had caused her difficulties. [T. 551]. According to the Plaintiff, she improved when she was placed on bed rest, but as soon as she resumed normal activity, her pain returned. [T. 552]. Specifically, the Plaintiff noted that, during an examination that took place a week prior to the Hearing, her physician had stated that she believed that the Plaintiff's herniation had worsened, and had given rise to fecal incontinence, causing her to order an MRI to test that theory, and that was to be conducted later that month. [T. 552-53].

- 26 -

The ALJ next asked the Plaintiff about her history of depression, and the Plaintiff explained that she had never been hospitalized for psychiatric reasons, and that she took Cymbalta for psychiatric impairments, which prevented her from breaking down and crying all of the time. [T. 553-54]. The Plaintiff added that she also took a medication for attention deficit disorder, which helped her to be alert, but also gave rise to anxiety. [T. 554-55]. As a consequence of her anxiety, the Plaintiff also took Xanax. [T. 555]. The ALJ then asked the Plaintiff if she experienced any other psychiatric symptoms, and the Plaintiff replied that she became overwhelmed when she tried to work and failed. [T. 555-56].

The ALJ asked the Plaintiff if she could give an example of a time when she became overwhelmed, and the Plaintiff explained that, in 2004 or 2005, she had attempted to work as a babysitter, but that she began to experience migraine headaches, and left arm pain, that numbed her left arm for approximately forty-five (45) days. [T. 557]. Elaborating, the Plaintiff stated that those symptoms appeared unexpectedly, and that the numbness in her left arm had caused her to have to eat with her right hand. [T. 558]. The Plaintiff was treated with Prednisone for the arm pain and numbness, which was successful, but when she ceased taking that medication, the arm pain and migraines returned. Id. According to the Plaintiff, the pain had also

- 27 -

shifted to her right side, and consequently, her physicians had ordered an MRI, which suggested that her herniations had increased.  [T. 559-60].

The ALJ then asked the Plaintiff about her fecal incontinence, and the Plaintiff stated that she experienced that symptom several times a day, for a stretch of four (4) or five (5) days, approximately once a month.  [T. 560].  According to the Plaintiff, she had lost sixteen (16) pounds through diarrhea, when she attempted to take antibiotics for her incontinence, and therefore, she currently treated herself with herbal supplements.  [T. 561].  The Plaintiff testified that, when she attempted to eat "normal food," such as fast food, her digestive system would shut down. [T. 561-62]. The ALJ asked the Plaintiff if she had experienced significant weight gain or loss, and the Plaintiff stated that, when she first started experiencing pain in 2002, she had gained fifty (50) to sixty (60) pounds.  [T. 562].  According to the Plaintiff, a lot of her pain medications caused her to sleep excessively.  [T. 562-63]

Next, the ALJ asked the Plaintiff about her family, and the Plaintiff stated that she has a son, who is fourteen (14) years old, and a daughter, who is twelve (12) years of age.  [T. 563].  The Plaintiff explained that her husband got the children ready for school, as she was unable to help.  Id.  The Plaintiff denied smoking or consuming alcohol.  Id.

- 28 -

The ALJ asked the Plaintiff to describe the pain that she experienced in her hands or arms, and the Plaintiff explained that she suffered from pain down her left arm that terminated in her hand, which caused writing to be painful.  Id.  As related by the Plaintiff, the pain in her left arm was constant, but was not always so severe that it prevented her from using her left arm.  [T. 564].

The ALJ asked the Plaintiff about her education, and the Plaintiff stated that she had a college degree.  Id.  In response to the ALJ's next inquiry, the Plaintiff testified that she was able to drive a car, but did not drive at night because she had poor concentration, and found it painful to be in a car for long periods, because of her left arm and left hip.  [T. 564-65].  The ALJ asked the Plaintiff if she was able to take care of herself, and the Plaintiff replied that her husband and children did most of the cooking and grocery shopping, although she would accompany them to the grocery store.  [T. 565].

The ALJ then turned his questioning to the Plaintiff's left side pain, and the Plaintiff stated that her left hand arm pain interfered with her daily activities, as she was left handed, and that her left hip pain had recently increased, and, as a result, her physicians had ordered an MRI of her hip.  [T. 566].  The Plaintiff explained that she

did not use a cane, but that she had recently suffered a fall when her left side had become fatigued. [T. 567].

Next, the ALJ asked the Plaintiff about the transmission business that her husband had recently begun, and she explained that the original plan had been for her to work in the office, but that she was not currently involved in the business as her husband was bipolar, and verbally abusive to her. [T. 568].

The ALJ asked about the recommendation of one of her physicians, in January of 2005, that the Plaintiff could sit for up to one (1) hour at a time, and the Plaintiff affirmed that she could do that, and could stand for approximately fifteen (15) minutes at a time, and walk for about an hour in an eight (8) hour day. [T. 569]. The Plaintiff added that her shoulder, arm, and neck pain, was not simply an ergonomic problem, as she experienced pain even while sitting and drinking coffee. Id. According to the Plaintiff, when she used a computer, she could sit back and extend her arms out to the table to type, but that she tried not to type for more than fifteen (15) minutes at a time. [T. 569-70]. The Plaintiff explained that she had recently been using a computer, in order to send e-mails to her family about her father's medical condition, and noted that his illness had affected her emotionally. Id.

The Plaintiff's attorney then initiated her examination of the Plaintiff by asking her about how often she took naps, and the Plaintiff stated that she usually napped twice a day, for a total of approximately six (6) hours. [T. 571]. The Plaintiff added that she had problems with stress, which caused her to become depressed, experience panic, and have nightmares. [T. 571-72]. The Plaintiff attributed her stress to her husband's temper, and to problems with her teenaged children, as well as her father's illness. [T. 572]. The Plaintiff also stated that she experienced stress, from not being able to earn any income, as she had always been the primary worker in the family. Id.

The Plaintiff's attorney asked the Plaintiff if the symptoms of depression and pain interfered with her attention and concentration, and the Plaintiff stated that she was unable to perform accounting, and also tended to be forgetful. [T. 572-73]. According to the Plaintiff, on a good day she could be active between 10:00 o'clock a.m., and 5:00 o'clock p.m., and then take a nap between 5:00 o'clock p.m. and 7:00 o'clock p.m., whereas, on a bad day, she could only be active for approximately two (2) to four (4) hours. [T. 573]. The Plaintiff added that she experienced good days approximately two (2) or three (3) times a week, with the rest of the days being bad days. [T. 574].

- 31 -

The ALJ then asked the Plaintiff if she had anything to add, and the Plaintiff replied that she had begun experiencing symptoms of fatigue while working at American Medical Systems, which she described as a tough and hostile work environment.  Id.  The ALJ asked the Plaintiff if she had engaged in full-time work since March of 2002, and the Plaintiff replied that she had not.  [T. 574-75].  The ALJ asked the Plaintiff about notes in the Record, which suggested that she had been fired from Capella University for not having a Master's degree, and the Plaintiff explained that she attempted to return to work, and retrain for online teaching, and had worked as an instructor part-time for one (1) year, in 2004.  [T. 575-76].  Following her termination from that position, the Plaintiff had attempted to work as a babysitter.  [T. 576-77].

The ALJ then swore the Medical Expert ("ME") to testify, and asked him if he had reviewed the evidence in the file.  [T. 577].  The ME stated that he had, and the Plaintiff's counsel noted no objections to the ME's qualifications.  Id.  The ALJ asked the ME if he had any questions for the Plaintiff, and he replied that he did not.  Id.  The ALJ then continued the Hearing by asking the ME to set forth the Plaintiff's impairments as he noted them from the interview.  Id.  The ME observed that the Plaintiff had been treated for cervical disk disease, fibromyalgia, headaches, which

- 32 -

were a combination of migraine and cervical disk disease, vertigo, low back pain, restless leg syndrome, lactose intolerance, acute and chronic sinusitis, fasciitis, chronic pain syndrome/myofascial pain syndrome, somatoform pain disorder, and anxiety and depression.  [T. 577-78].

The ALJ then asked the ME if, in his opinion, the Plaintiff's impairments met or equaled the Listings, and the ME stated that he found that they did not, as he did not find that the Plaintiff's cervical disk disease met the Listings level of severity, in terms of loss of motor strength or sensation, and added that there is no Listing for fibromyalgia, and that the Plaintiff's other impairments did not appear to be severe. [T. 579].

The ALJ then asked the ME what kinds of limitations he would impose on a work setting based on the Record before him.  Id.  The ME replied that the Record would support sedentary work, sitting six (6) hours a day, and standing or walking two (2) hours a day, with no climbing, and only occasional overhead work, and no exposure to temperature extremes, or vibration.  Id.

The ALJ then invited the Plaintiff's attorney to question the ME.  Id.  The Plaintiff's attorney asked the ME if, based upon the Record, he would anticipate that absenteeism from work would be a problem, and the ME replied that the Plaintiff's

physicians had suggested that she was not able to perform low stress jobs, but that he was not able to comment on the Plaintiff's psychiatric symptoms. [T. 580]. In addition, the ME noted that the RFC evaluations from the Plaintiff's physicians had mentioned absenteeism of four (4) times a month due to fibromyalgia, but that it was not clear from the Record if that was due to physical or psychiatric symptoms. Id. The Plaintiff's attorney asked the ME if, given the impairments that he had listed, he would anticipate that some days would be better than others, and the ME agreed with that statement, and also noted that individuals, who are in pain, often suffer from a decrease in concentration. Id.

The Plaintiff's counsel concluded her examination of the ME, and the ALJ dismissed the ME, and swore the Vocational Expert ("VE") to testify. [T. 581]. After affirming that the VE had reviewed the Record, and that he was familiar with jobs within the State of Minnesota, the ALJ confirmed that the Plaintiff's attorney had no objections to the VE's qualifications. Id. The VE had no questions for the Plaintiff regarding her past work history, and the ALJ then asked the VE if he had any changes or corrections to make to his report. Id. The VE stated that the testimony suggested that the Plaintiff was apparently not functioning in the capacity of an owner/partner of a business, and so removed that entry from the Plaintiff's work history. Id.

- 34 -

The ALJ then posed a hypothetical to the VE, asking him to assume a female individual who was forty-five (45) to forty-nine (49) years old, with sixteen (16) years of education, with past work as set out in the Record, and with the impairments noted in the Record.  [T. 582].  The ALJ noted that, if he assumed the doctor's limitations regarding the individual, she would be at the sedentary range, capable of lifting not more than ten (10) pounds on an occasional basis, and five (5) pounds more frequently, and being on her feet at least up to two (2) hours of the work day, and sitting up to six (6) hours per day.  Id.  The individual should not engage in climbing, or more than occasional reaching overhead, and have no exposure to temperature extremes or vibrations.  [T. 582-83].  The ALJ asked the VE if that hypothetical individual could perform the Plaintiff's previous relevant work.  [T. 583].  The VE replied that the individual could perform the Plaintiff's past relevant work as a communications manager.  Id.

The ALJ then asked the VE if he would change his assessment if the individual were restricted to a position without high production goals or quotas, where she would not have to meet a constant sales requirement on a daily or weekly basis, and would not have to deal with the public on more than a brief and superficial basis.  Id.

The VE stated that, even with those limitations, the individual could not perform her past relevant work.  Id.

The ALJ then asked the VE if there was any work in the regional or national economy for a person with such limitations, and the VE advised that there were positions, such as inspector/cuff folder, with an excess of 1,200 positions available in Minnesota.  Id.  The VE also suggested the position of polisher/deburrer, with 3,000 positions available, or sorter, with 2,200 positions available, would be suitable. [T. 583-84].

The ALJ then posed a third hypothetical to the VE, in which the individual was unable to understand, remember, and carry out, complex job instructions, and the VE stated that such a limitation would not impact upon his assessment, but that, if the individual were unable to demonstrate reliability, that would preclude competitive employment.  [T. 584].  The VE concluded by affirming that his testimony had been consistent with the Dictionary of Occupational Titles.  [T. 585].

The Plaintiff's attorney then examined the VE, and asked him if the individual were able to stand and walk for less than two (2) hours, and to sit for two (2) hours in a full day, if that would prelude full-time employment, and the VE agreed that it would.  Id.  The Plaintiff's attorney asked about how many days of absenteeism were

tolerated by employers, and the VE replied that two (2) days a month, or twenty-four (24) days a year, was the limit, including vacations and other days off.  Id.  The VE added that many employers would not tolerate any absenteeism during the first ninety (90) days of employment, and that, after that time had been served, more than three (3) or four (4) days of unscheduled sick time would eliminate competitive employment.  [T. 586].  In addition, the VE noted that jobs, in the categories that he had listed, were generally very strict regarding unscheduled absences, and would tolerate two (2) breaks of fifteen (15) minutes each, and a lunch break of thirty (30) minutes, with additional break requests precluding employment.  [T. 586-87].  In response to further inquiry from the Plaintiff's counsel, the VE noted that the inability to tolerate any stress, or to sustain concentration, would also preclude employment.  [T. 587].

The Plaintiff's attorney then asked the VE to review a report, that was included in the Record, which stated that the Plaintiff had no ability to tolerate stress or function independently, and suffered from fatigue, and the VE stated that, if the diagnosis were given to the hypothetical individual, it would suggest that she would miss more than three (3) days of work a month, and so would not be capable of full-time work.  [T. 588].  The ALJ asked the Plaintiff's attorney about the specialty of the

physician who wrote that assessment of the Plaintiff, and the Plaintiff's attorney stated that it was the Plaintiff's family practice physician.  Id.

The ALJ then concluded the Hearing, and thanked the Plaintiff for her testimony.  [T. 589].

C.    The ALJ's Decision.  The ALJ issued his decision on August 25, 2006. [T. 17-27].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §404.1520.[16]  As a threshold matter,

---

[16]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work

- 38 -

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 30, 2002.  [T. 19].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise her ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by degenerative disc disease, fibromyalgia, migraine headaches, restless leg syndrome, chronic pain syndrome, somatoform pain disorder, and depression with anxiety.  [T. 19-20].  The ALJ found that the Plaintiff's physical impairments resulted in more than minimal limitations on her ability to perform basic work-related activities, and that her mental impairments caused her to be mildly restricted in activities of daily living, have moderate difficulties maintaining social function and concentration, persistence and pace, with no episodes of decompensation.  Id.  In addition, the ALJ found that the Plaintiff's chronic pain syndrome, somatoform pain syndrome, and depression, resulted in more than minimal limitations on her ability to perform basic work-related activities.  [T. 20].

---

existing in the national economy.  Id. at 754.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole.  Id.  He noted that the ME testified that the Plaintiff's degenerative disc disease did not meet the Listings requirements, as she did not exhibit any neurological findings on examination, and did not demonstrate decreased motor strength or sensation.  Id.  The ME further stated that there is no Listing for fibromyalgia, and that the Plaintiff's symptoms did not rise to the level of any other Listed Impairment.  Id.  The ALJ placed significant weight on the ME's opinion, and noted that no physician, or other medical source, had offered any findings that could be considered medically equal to any impairment described in the Listings.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by her past relevant work, or whether she was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of

physical limitations that can affect the ability to perform work-related tasks.  See,

Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized

that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the

symptoms, including the Plaintiff's subjective complaints of pain, and that those

complaints were to be evaluated under the standard announced in Polaski v. Heckler,

739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R.

§404.1529.

After considering the entire Record, including the testimony adduced at the

Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the

impartial ME; the objective medical evidence; and the Plaintiff's subjective

complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity for
> sedentary work and can lift 10 pounds occasionally and 5
> pounds frequently and can stand and/or walk for 2 hours
> and sit for 6 hours in an 8 hour workday.  In addition, [the
> Plaintiff] is precluded from work that requires climbing
> ladders, ropes and scaffolds or exposure to extreme cold,
> heat or vibrations and can only occasionally reach
> overhead.  As a result of her mental impairments, [the
> Plaintiff] is precluded from work with high production
> goals or quotas or work that requires more than brief and
> superficial contact with the public.

Id.

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that she had been disabled by her physical impairments from all work activity since March 30, 2002.  Id.

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that she had been unable to work since March 30, 2002, because of extreme and chronic pain and fatigue, which was physically and emotionally exhausting, and rendered her unreliable.  [T. 21].  The Plaintiff also reported that, on occasion, she was in such extreme pain that she was incapable of getting out of bed, and that her pain was worsened by bending, jarring, lifting, running, sitting, standing and twisting, and resulted in left leg numbness, tingling and weakness.  Id.

The ALJ considered the Record, and found that the objective evidence did not support the Plaintiff's assertions of disability.  Id.  In arriving at that conclusion, the ALJ noted that an MRI, which was taken of the Plaintiff's cervical spine, revealed only mild, broad-based disc bulging, with no focal nerve root impingement, and that an EMG for left limb pain was normal, with no evidence of left cervical radiculopathy, carpal tunnel syndrome, or ulnar neuropathy.  Id.  As noted by the ALJ, on examination, the Plaintiff demonstrated full cervical extension and forward flexion, and the Plaintiff's treating physician, Dr. Venya, stated that he did not

believe that surgical treatment would benefit the Plaintiff, as she had diffuse and mild changes. Id. In addition, Dr. Wolfson, who is also a treating physician, stated that the Plaintiff's pain could not be the result of a cervical spine problem, as imaging studies had shown that nothing was seriously wrong with her spine. Id.

As for the Plaintiff's claims relating to her lumbar spine, the ALJ noted that an MRI had revealed broad-based disc bulging, without significant central canal or neural foraminal stenosis, and no evidence of focal nerve root impingement was observed. Id. The Plaintiff was assessed with bilateral degenerative arthritis, but the ALJ saw no evidence in the Record to support the Plaintiff's claim of left leg radiculopathy, and her gait had been observed as normal, although she was tender to palpitation. Id. Reviewing the Record, the ALJ found that the Plaintiff had exhibited a full range of motion in her low extremities, and had shown no problems with instability, luxations or subluxations in the bilateral extremities, and had normal tone and strength with no flaccidity, spasticity, or atrophy. Id. The Plaintiff's straight leg raising was negative to radicular pain, and her deep tendon reflexes were normal with no loss of sensation. Id.

The ALJ next noted that, while the Plaintiff claimed a twenty (20) year history of back pain, she asserted that, when she was diagnosed with fibromyalgia, her back

pain worsened to the point that she was unable to participate in her normal activities of daily living.  Id.  Examining the Record, the ALJ found that the Plaintiff had modest areas of tenderness over several joints, and that almost all of her fibromyalgia tender points were in fact tender, but examination had not revealed any evidence of specific peripheral joint swelling, erythema, warmth, loss of motion, painful motion, instability, or muscular weakness.  Id.  Dr. Wolfson noted that the Plaintiff had checked almost all of the items on the Review of Symptoms and History form, and that the Plaintiff had a wide variety of complaints, which basically included everything, although he was not particularly concerned about any of them.  [T. 21-22].

Turning to the Plaintiff's complaints of migraine headaches, the ALJ noted that the Plaintiff had stated that Cymbalta relieved her headache symptoms, and improved her fatigue.  [T. 22].  Although the Plaintiff was also diagnosed with restless leg syndrome, the ALJ noted that her symptoms were reported to be controlled with Mirapex.[17]  Id.

_____

[17]Mirapex is "indicated for the treatment of moderate-to-severe primary Restless Legs Syndrome."  Physician's Desk Reference, p. 850 (62nd ed. 2008).

The ALJ also found that the Plaintiff's course of treatment was inconsistent with her assertions of disability. Id. Specifically, he noted that the treatment for her back pain, and fibromyalgia, was conservative, and consisted mostly of trigger point injections in 2002, and 2003, occupational therapy, acupuncture, chiropractic treatment, aquatic therapy, massage therapy, and a home exercise program. Id. The Plaintiff had also been prescribed Cymbalta for pain, and had reported that she tolerated that medication well, that it controlled her migraine headaches well, and that her restless leg syndrome was controlled with Mirapex. Id. In September of 2005, the Plaintiff reported that her migraines were completely resolved, and that her fibromyalgia was stable, if not improving. Id. The ALJ concluded that the relatively conservative course of treatment, which the Plaintiff had reported to be effective in controlling her symptoms, established that her impairments were not as limiting as she claimed. Id.

As for the Plaintiff's mental impairments, the ALJ noted that the Plaintiff had been diagnosed with a pain disorder associated with both psychological factors, and a general medical condition which had been diagnosed as chronic pain syndrome, myofascial pain syndrome and/or somatoform pain syndrome. Id. Dr. Belgrade, who is a treating physician, noted that the Plaintiff's multiple somatic symptoms were

likely contributed to by emotional distress, as the Plaintiff reported having controlling parents, an abusive boss, and family and financial stressors.  Id.  Dr. Belgrade encouraged the Plaintiff to consider an alternative way of treating her symptoms, such as expressing her emotions more freely and meeting with a counselor, and noted that the Plaintiff's somatoform disorder caused her physical pain to vary significantly with her anxiety level.  Id.

The ALJ considered the Plaintiff's diagnoses of recurrent major depression with anxiety, and noted that the Record reflected that she had not reported any suicidal ideation, delusional or paranoid thinking, or mania.  Id.  In addition, the Plaintiff had been found to have intact short and long term memory, normal judgment, and average intellectual functioning.  Id.

As noted by the ALJ, the State Agency psychiatrist opined that, as a result of the Plaintiff's mental impairments, she experienced mild restrictions in her activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, pace and persistence, and experienced no episodes of decompensation.  Id.  The ALJ placed significant weight on the opinion of the State Agency psychiatrist, as he had the opportunity to review all of the

Plaintiff's medical records, and his opinion was consistent with those records. [T. 22-23].

The ALJ concluded that the Plaintiff experienced mild restrictions in her activities of daily living as a result of her mental impairments. [T. 23]. The Plaintiff testified that she lived with her husband and children, and that she took care of the children on a daily basis, and also that she showered and applied makeup daily. Id. According to the Record, the Plaintiff did laundry for herself and her family twice a week, went grocery shopping with her husband, and performed gardening -- an activity that she loved -- while using a bench. Id. The Plaintiff reported that she picked up around the house daily, used her computer and sent e-mails regularly, and was able to drive a car and to take care of the family dog. Id. Outside of the house, the Plaintiff reported volunteering at her church and doing freelance work, and visiting with family and friends often, and she stated that she tried to exercise on a weekly basis. Id.

With respect to social functioning, the ALJ noted that the Plaintiff experienced moderate difficulties, as the Plaintiff reported that she and her family generally got along well together, and that she had a supportive network of friends and extended family members, and spoke often with her friends and neighbors. Id. The Plaintiff

reported to Dr. Selin that she experienced feelings of resentment and loneliness, which had resulted in lashing out or isolation, and that she found herself having fewer contacts with her friends.  Id.  As Dr. Selin had concluded that the Plaintiff might have difficulties with job tasks that required sustained contact with people, due to anxiety about her family problems, the ALJ found that the Plaintiff was limited to brief and superficial contact with the public.  Id.

The ALJ found that the Plaintiff experienced moderate difficulties maintaining concentration, persistence, and pace.  Id.  Despite the Plaintiff's claim, that she had difficulty focusing and concentrating, her attention and concentration were assessed as normal in a mental status examination and, in January of 2006, she was taking Ritalin, which significantly improved her concentration and focus, and also increased her energy level and overall alertness.  Id.

On examination, Dr. Selin noted that the Plaintiff's IQ was within the average range, that her memory for events, names, and objects, was adequate, and that she showed no difficulty following instructions or remembering names, dates, objects or events, although the Plaintiff exhibited impaired concentration on Digit Span Tests. Id.  Dr. Selin observed that the Plaintiff showed low average concentration, and was able to persist for the duration of the four (4) hour examination, but opined that the

Plaintiff might have difficulty tolerating stress in the workplace due to depression. Id. Based on those findings, the ALJ limited the Plaintiff to work that did not require high production goals or quotas. Id.

The ALJ found that the Plaintiff had not experienced any episodes of decompensation, had not undergone a psychiatric hospitalization, been required to leave a work-like setting due to psychologically based symptoms, or experienced an inability to leave her home or meet the demands of a changing environment. [T. 24]. In addition, the ALJ noted that the Plaintiff's course of treatment for her mental impairments consisted of therapy, and psychotropic medication. Id. The Record reflected that the Plaintiff's mental impairments were significantly impacted by external stressors, and that the Plaintiff reported working for three (3) years in a hostile work environment, which took a toll on her satisfaction with her job, and her ability to continue working. Id. The Plaintiff also testified to stressors including having a husband with bipolar disorder, and a child with attention deficit disorder, as well as financial stressors. Id. The ALJ noted that the Plaintiff's symptoms of pain and depression had been found to fluctuate significantly with her level of anxiety, which suggested that her symptoms were not as consistently limiting as she claimed. Id.

- 49 -

The ALJ found that the Plaintiff's testimony was not entirely credible.  Id.  The Plaintiff testified that she experienced chronic diarrhea, and alternating constipation, and incontinence, due to a disc herniation.  Id.  The ALJ found that the Plaintiff had not reported this condition to any treating physician, and had not received any treatment for this asserted impairment.  Id.  The Plaintiff also testified that she experienced severe pain and numbness in her left arm, which rendered it nearly useless, but the ALJ found no objective medical evidence that the Plaintiff had reported pain, or numbness, of such severity to any treating physician.  Id.

An EMG for left limb pain was normal, and the ALJ found that the Plaintiff had not demonstrated any loss of range of motion, strength or sensation in her upper extremities.  Id.  Although the Plaintiff also claimed left hip pain that required her to use a cane to ambulate, and caused her to fall down, x-rays of her bilateral hips showed no significant abnormality of either her pelvis or either hip, and no significant arthritic changes were demonstrated.  Id.  Moreover, the Plaintiff had not reported falling down, due to an inability to lift her leg fully off the floor, to any treating physician.  Id.

The ALJ further noted that, although the Plaintiff reported disability and fatigue, the Record showed that she had responded well to treatment and, in

particular, that Cymbalta eliminated her migraine headaches and improved her pain and fatigue. Id. In addition, in October of 2005, the Plaintiff stated that she was not bothered by fatigue, and that her depression was better, and her fibromyalgia was stable and possibly better. Id.

The ALJ next turned to the Plaintiff's work history, and found that she had a significant work history through 2002, which the Plaintiff reported ended due to a hostile work environment, which caused significant stress. Id. The ALJ noted that the Plaintiff claimed that she was overwhelmed by the thought of returning to work full time, because she was afraid that she would fail, and that she had shown no effort to find other work, or that she was willing to work with a vocational rehabilitation program to find a job that she could perform, given her limitations. [T. 25]. The ALJ concluded that the Plaintiff was not motivated to work. Id.

The ALJ noted that he had considered the opinion of the ME, that the Plaintiff could perform work at the sedentary level, and that he had given significant weight to that opinion, as the ME had the opportunity to review the entire Record, which provided him with longitudinal knowledge of the Plaintiff's impairments, and placed him in the best position to assess her limitations. Id. The ALJ also considered the opinion of the State Agency, non-examining physician, who concluded that the

Plaintiff was able to lift twenty (20) pounds occasionally, and ten (10) pounds frequently, and could stand and/or walk for six (6) hours, and sit for six (6) hours in a workday, and placed some weight on that opinion. Id.

However, the ALJ found that, in light of the more recent medical records, that were introduced for the first time at the Hearing, and giving the Plaintiff's subjective complaints the benefit of all reasonable doubt, the Plaintiff's RFC should be reduced to sedentary work. Id. Finally, the ALJ considered the opinions of Drs. Stenehjem-Kelsch and Sczublewski, who both concluded that the Plaintiff was unable to lift any weight, and could not stand for more than two (2) hours, or sit for more than two (2) hours, in a workday, and would be absent more than three (3) to four (4) days per month. Id. The ALJ declined to place significant weight on those opinions, as he found that they were not supported by objective medical findings, and were inconsistent with the overall evidence in the Record. Id.

Finally, the ALJ considered the Plaintiff's mental impairments, and in so doing, he weighed the opinion of the consultative examiner, Dr. Selin, who stated that the Plaintiff might have difficulty tolerating stress in the workplace, due to depression, and might have difficulty with job tasks requiring sustained contact with people, due to anxiety. Id. The State Agency non-examining physician likewise opined that the

Plaintiff could work with the public on a brief and superficial basis, and could concentrate on, understand, and remember, routine and repetitive tasks and uncomplicated instructions. Id. The ALJ placed significant weight on the opinions of Dr. Selin, and the State Agency physician, as they both had an opportunity to review the Record, and so were in a good position to assess the Plaintiff's limitations. Id. As noted by the ALJ, Dr. Selin also had the opportunity to examine the Plaintiff. Id. As a result, the ALJ incorporated those limitations into the Plaintiff's RFC. Id.

The ALJ also considered the statement by Dr. Stormo, who is the Plaintiff's therapist, that the Plaintiff did not have the ability to demonstrate reliability due to her pain disorder and fatigue. [T. 26]. The ALJ declined to place significant weight on Dr. Stormo's opinion, as he found that it was based solely on the Plaintiff's own subjective complaints, rather than on objective findings. Id. Thus, based on the substantial weight of the objective medical evidence, the Plaintiff's course of treatment, her level of daily activity, her work history, and the opinions of the ME, the State Agency physician, and Dr. Selin, the ALJ found that the Plaintiff retained the RFC for sedentary work. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had found, that the Plaintiff would be

unable to perform her past relevant work as a director of communications, a communications manager, and a child care provider. Id.

Accordingly, the ALJ noted that the final step was to determine whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given her RFC, age, education, and work experience. Id. The ALJ expressly noted that the burden of proof shifts, at that Step, to the Commissioner. Id. The ALJ noted that the Plaintiff, as a younger individual with a high school education, and an ability to communicate in English, could find employment in a range of sedentary work, including as an inspector/cuff folder, of which there were 1,200 such jobs available; a polisher/embroiderer, with 3,000 jobs available; or a sorter, with 2,200 positions available. [T. 27]. As a result, the ALJ determined that the Plaintiff was capable of performing other jobs existing in significant numbers in the national economy. Id.

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time from March 3, 2002, through the date of his decision, which was August 25, 2006. Id.

IV.  Discussion

A.    Standard of Review.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

- 56 -

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo. See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.    Legal Analysis. In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

1.    That the RFC determined by the ALJ was
      incorrect; and,

2.    The ALJ Could Not Properly Rely on the
      Testimony of the VE to Meet Her Burden at
      Step 5, as He did not Propound a Proper
      Hypothetical.

See, Plaintiff's Memorandum, Docket No. 10, at 39.

In actuality, the principal thrust of the Plaintiff's argument rests on her contention

that the ALJ improperly weighed the conflicting medical opinions. Since we find that

issue dispositive, we limit our analysis to the ALJ's resolution of the competing

medical opinions.

1.   Standard of Review. When a case involves medical opinion --

which is defined as "statements from physicians and psychologists or other acceptable

medical sources" -- the opinion of a treating physician must be afforded substantial

weight. 20 C.F.R. §404.1527; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th

Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater,

121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Nevertheless, an opinion rendered by a claimant's treating physician is not

necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating

physician's opinion is generally entitled to substantial weight, although it is not

- 58 -

conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1328 (8th Cir. 1991); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise. <u>Id.</u> As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which

are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §404.1527(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §404.1527(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §404.1527(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.  See, 20 C.F.R. §404.1527(e)(1).

2.    Legal Analysis.  The Plaintiff argues that the ALJ improperly rejected the opinions of her treating physical and mental health doctors, and instead,

accepted the opinion of the ME, together with a one-time consultative psychologist, and an agency psychologist, who simply reviewed the Plaintiff's records, but did not examine her.

As initially voiced by the Plaintiff, her objection took the fairly routine form of expressing dissatisfaction that the ALJ did not accord the usually substantial weight that is applied to treating source opinions, see, Plaintiff's Memorandum in Support of Summary Judgment, Docket No. 10, at pp. 40-44, but with an unusual twist. The Plaintiff argues that the ALJ failed to explain why the opinions of the treating medical sources were not afforded substantial weight. Id. at 42 ("[The ALJ] provides no analysis, offers no explanation of his findings of lack of support and provides no examples of inconsistency."). We agree.

In his decision, the ALJ explains, in total, his less than deferential assessment of the Plaintiff's treating physicians, and psychologists, as follows:

> The undersigned has considered the opinions of Amy Stenehjem-Kelsch, M.D., and Jeff Soblewski,[18] M.D., who opined that claimant is unable to lift any weight and cannot stand more than 2 hours or sit more than 2 hours in an eight hour workday and would be absent more than three to four days per month. (Exhibits 12F and 16F) The undersigned declines to place significant weight on these opinions, as

_____

[18]We consider this to be a misspelling of Dr. Sczublewski's last name.

- 61 -

they are not supported by objective medical findings and is [sic] inconsistent with the overall evidence of record.

\*       \*       \*

Karla Stormo, Ph.D., claimant's therapist, opined that the claimant does not have the ability to demonstrate reliability due to her pain disorder and fatigue. (Exhibit 20F) The undersigned declines to place significant weight on Dr. Stormo's opinion as it appears to be based solely on claimant's own subjective complaints, rather than on objective findings. The undersigned places greater weight on Dr. Larson and Dr. Selin.

[T. 24-25].

The ALJ's analysis of the conflicting medical opinions went no further. He simply has not shared why he preferred the medical assessments of non-treating physicians, over those who were intimately involved in the Plaintiff's treatment, and he does not detail any deficiencies, or inconsistencies in the opinions of the treating medical sources, other than in the most conclusory way.

In response to the Plaintiff's argument, the Commissioner parsed the Record, and detailed a number of analyses that could have explained why the treating physicians' opinions were not entitled to great weight but, unfortunately, the ALJ offered no such rationale in his own decision. See, Defendant's Memorandum in Support of Summary Judgment, Docket No. 17, at pp. 19-21. Had the ALJ engaged

- 62 -

in the analysis now offered, for the first time by the Commissioner's legal counsel, we might be persuaded that the ALJ had satisfied his burden of allocating the weight to be placed upon conflicting expert opinion evidence, consistent with the applicable Regulations and case law -- but the ALJ made no such assessment of the conflicting opinions.

Recently, in <u>Chen v. Mukasey</u>, --- F.3d ---, 2007 WL 4482184 at *3 (8th Cir., December 26, 2007), our Court of Appeals highlighted the distinctions between a reviewing Court's assessment of a Jury Verdict, in comparison to Administrative Findings, as follows:

> First, under the rule of Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951), in reviewing administrative fact findings we are required to take into account the record "as a whole," considering evidence that detracts from the administrative finding. Menendez-Donis [v. Ashcroft,] 360 F.3d [915,] 918 [(8th Cir. 2004). In contrast, in reviewing a jury verdict, we draw every reasonable inference in favor of the verdict and may not make credibility determinations or weigh the evidence. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)(applying Fed.R.Civ.P. 50). Second, under SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), any administrative agency must describe its reasoning with "such clarity as to be understandable," SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), whereas a jury generally does not explain its reasoning. Because of these principles of

- 63 -

administrative law, "substantial evidence" review of administrative findings entails review of an IJ's [i.e., Immigration Judge's] credibility determinations, see, e.g., Singh v. Gonzales, 495 F.3d 553, 556-59 (8th Cir. 2007), whereas "substantial evidence" review of a jury's findings defers almost entirely to the jury's credibility determinations, Reeves, 530 U.S. at 150-51, 120 S.Ct. 2097 (reviewing court disregards all evidence "favorable to the moving party that the jury is not required to believe").     Applying the Chenery rule and the administrative "substantial evidence" rule together, courts often say that an IJ must give "specific, cogent" reasons for his findings. See Singh, 495 F.2d at 557-58.  In Singh, we explained that this means that an IJ making a credibility determination must "give reasons that are 'specific' enough that a reviewing court can appreciate the reasoning behind the decision" and cogent enough "that a reasonable adjudicator would not be compelled to reach the contrary conclusion.  Id.

Much earlier on, in S.E.C. v. Chenery Corp., 318 U.S. 80, 94 (1943), the Supreme

Court expressed the same rule, and its underlying rationale, as follows:

Congress has seen fit to subject to judicial review such orders of the Securities and Exchange Commission as the one before us.  That the scope of such review is narrowly circumscribed is beside the point.  For the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review.  If the action rests upon an administrative determination -- an exercise of judgment in an area which Congress has entrusted to the agency -- of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so.  But if the action is based upon a determination of law as to which the

- 64 -

reviewing authority of the courts does come into play, an
order may not stand if the agency has misconceived the
law.  In either event the orderly functioning of the process
of review requires that the grounds upon which the
administrative agency acted by [sic] clearly disclosed and
adequately sustained.   "The administrative process will
best be vindicated by clarity in its exercise." Phelps Dodge
Corp. v. National Labor Relations Board, 313 U.S. 177,
197, 61 S.Ct. 845, 853, 85 L.Ed. 1271, 133 A.L.R. 1217.
What was said in that case is equally applicable here: "We
do not intend to enter the province the [sic] belongs to the
Board, nor do we so.  All we ask of the Board is to give
clear indication that it has exercised the discretion with
which Congress has empowered it.  This is to affirm most
emphatically the authority of the Board." Ibid.  Compare
United States v. Carolina Carriers Corp., 315 U.S. 475,
488, 490, 62 S.Ct. 722, 729, 730, 86 L.Ed. 971. * * * We
merely hold that an administrative order cannot be upheld
unless the grounds upon which the agency acted in
exercising its powers were those upon which its action can
be sustained.

While Chenery involved the Securities and Exchange Commission, the same rule

applies to the Commissioner of Social Security.  See, e.g., Banks v. Massanari, 258

F.3d 820, 824 (8th Cir. 2001)(""[A] reviewing court may not uphold an agency

decision based on reasons not articulated by the agency," when "the agency [has]

fail[ed] to make a necessary determination of fact or policy" upon which the court's

alternative basis is premised."), quoting Healtheast Bethesda Lutheran Hosp. and

Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir. 1998), as "discussing the

limitations on the rule made by the Supreme Court in S.E.C. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)"); In Home Health v. Shalala, 1997 WL 269486 at *4-5 (D. Minn., March 5, 1997)("At the same time, the court cannot uphold the Secretary's decision based upon reasons she did not articulate in the decision itself."), citing Mayo v. Schiltgen, 921 F.2d 177, 179 (8th Cir. 1990).

Of course, in the context of the judicial review of Social Security disability decisions, the Chenery rule most frequently finds expression in the requirement that the ALJ "must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints." Eichelberger v. Barnhart, supra at 589; see also, Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007). Our Court of Appeals has also recognized that "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), quoting Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001); Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006)(same), quoting Vandenboom v. Barnhart, supra at 749-50; Casey v. Astrue, supra at 691 ("The ALJ had a duty to evaluate the medical evidence as a whole."), citing Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir.

2007)("It is the ALJ's duty to resolve conflicts in the evidence."), citing <u>Hacker v. Barnhart</u>, supra at 936.

Here, the ALJ plainly resolved the conflicts in the medical opinion evidence, but we have no showing that he did so within the framework mandated by the Social Security Regulations.   As our Court of Appeals has explained:

> The SSA regulations set forth how the ALJ weighs medical opinions.  The regulations provide that "unless [the ALJ] give[s] a treating source's opinion controlling weight * * * [the ALJ] consider[s] all of the following factors in deciding the weight [to] give any medical opinion: (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) any factors [the applicant] or others bring[s] to [the ALJ's] attention.

<u>Wagner v. Astrue</u>, supra at 848, quoting <u>20 C.F.R. §404.1527(d)</u>.

Apart from the conclusion that the ALJ reached, we are unable to determine, here, what factors, if any, were considered by the ALJ in reaching that conclusion.  Where the medical evidence is ambiguous, the Court has required a remand.  See, <u>Coleman v. Astrue</u>, 498 F.3d 767, 773 (8th Cir. 2007)(remanding case to ALJ to clarify an ambiguity in the medical opinions).

While the ALJ's failure to explain the basis for his rejection of the treating sources' medical opinions is fundamental error, the effect of that error is particularly aggravated when the enigmatic course of fibromyalgia is involved.  Our Court of

Appeals has recognized that "(1) fibromyalgia is a chronic condition, usually diagnosed after eliminating other conditions; (2) no confirming diagnostic tests exist; and (3) our Court has long recognized that fibromyalgia might be disabling." Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005), citing Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 1004); Pirtle v. Astrue, 479 F.3d 931, 935 (8th Cir. 2007)("We have previously recognized that fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling), citing Garza v. Barnhart, supra at 1089.

As a consequence, when fibromyalgia is one of the severe impairments, upon which a Plaintiff seeks a disability finding, the Court has frequently been confronted with a determination as to whether an ALJ's discrediting of the medical opinions of treating sources was appropriate. See, e.g., Cline v. Sullivan, 939 F.2d 560, 566-567 (8th Cir. 1991)(reversing ALJ's discounting of medical opinion evidence); Kelley v. Callahan, supra at 589-90 (reversing ALJ's discrediting of medical opinion evidence); Forehand v. Barnhart, supra at 986-988 (reversing ALJ's discrediting of medical opinion evidence); Cox v. Barnhart, 345 F.3d 606, 608-610 (8th Cir. 2003)(reversing ALJ's discounting of medical opinion evidence); Hatcher v. Barnhart, 368 F.3d 1045, 1046-47 (8th Cir. 2004)(reversing ALJ's discrediting of medical opinion evidence); Garza v. Barnhart, supra at 1089-90 (reversing ALJ's discrediting of medical opinion

evidence); Hacker v. Barnhart, supra at 937-39 (affirming ALJ's rejection of medical opinion evidence); Pirtle v. Astrue, supra at 934-35 (affirming ALJ's rejection of medical opinion evidence); Leckenby v. Astrue, 487 F.3d 626, 632-33 (8th Cir. 2007) (reversing ALJ's rejection of medical opinion evidence); Miller v. Astrue, 233 Fed.Appx. 590, 592 (8th Cir. 2007)(affirming rejection of medical opinion evidence); Casey v. Astrue, supra at 691-95 (affirming rejection of medical opinion evidence); Flynn v. Astrue, --- F.3d ---, 2008 WL 150599 at *4-6 (8th Cir., January 17, 2008).

In assessing the propriety of the ALJ's appraisal of treating physician opinions, the Court, in those past decisions, has had a benefit not allowed us here -- the Court had findings, and analysis by the ALJ, which allowed the Court to determine whether the ALJ had adhered to the governing law. Here, we have no more than a bald conclusion, which effectively precludes responsible judicial review.[19] Of course, we

---

[19]We understand the basis for the ALJ's rejection of the opinions of Drs. Stenehjem-Kelsch, and Sczublewski, to the effect that the Plaintiff could lift no weight, given the abundance of evidence to the contrary. We find it significant, however, that three (3) of the Plaintiff's treating medical sources concluded that, owing to the symptoms of her fibromyalgia, the Plaintiff would miss three (3) or (4) workdays each month. The VE testified that such a rate of absenteeism would be inconsistent with competitive employment, [T. 585-86], and neither the ME, nor any other medical source, expressed any opinion on the issue of absenteeism, as the ME simply testified that it was not clear whether the treating medical sources were premising their opinion on the Plaintiff's physical or psychiatric symptoms. [T. 580]. Notably, the ALJ failed to express any specific reason for his rejection of the conjoined opinions of the Plaintiff's treating medical sources.

are mindful that the Commissioner, in support of his Motion for Summary Judgment,

has constructed arguments which would suggest that the ALJ had good grounds to

discount the opinions of the Plaintiff's medical sources, but those constructions do

not allow us to abdicate our responsibility to undertake a principled review of the

ALJ's factual findings.  As the Court explained, in <u>Chenery</u>:

> The Commission's action cannot be upheld merely because
> findings might have been made and considerations
> disclosed which would justify its order as an appropriate
> safeguard for the interests protected by the Act.  There
> must be such a responsible finding.  Compare United States

---

Lastly, we recognize that, "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."  <u>Mausolf v. Babbitt</u>, 125 F.3d 661, 667 (8th Cir. 1997), cert. denied, 524 U.S. 951 (1998), quoting <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys. Inc.</u>, 419 U.S. 281, 285-86 (1974); see also, <u>Nat'l Ass'n of Home Builders v . Defenders of Wildlife</u>, --- U.S. ---, 127 S.Ct. 2518, 2530 (2007); <u>Chanmouny v. Ashcroft</u>, 376 F.3d 810, 812 (8th Cir. 2004).  Here, we recognize the ALJ's destination, but we are unable to determine what analysis reasonably served as his path.  Accordingly, a remand is necessary.  See, <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985)("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); <u>Dakota Underground, Inc. v. Secretary of Labor</u>, 200 F.3d 564, 568 (8th Cir. 2000).

> v. Chicago, M., St. P. & P.R. Co., 294 U.S. 499, 510, 511,
> 55 S.Ct. 462, 467, 79 L.Ed. 1023.  There is no such finding
> here.

S.E.C. v. Chenery Corp., supra at 94; Mayo v. Schiltgen, supra at 179 ("In other words, a reviewing court cannot search the record to find other grounds to support the decision.").[20]

Nor is there such a finding here, and therefore, we recommend that the cross-Motions for Summary Judgment be denied, and that the matter be remanded for such further proceedings, consistent with this Report, as may be appropriate.[21]

NOW, THEREFORE, It is --

---

[20]We are mindful that the Plaintiff has urged a reversal, with an award of benefits to her.  Under Chenery, that would be inappropriate given the absence of proper fact finding and, in any event, the Record, in this unfinished state, does not unequivocally warrant an award of benefits to the Plaintiff.

[21]While not addressed by either party, we are also troubled by the ALJ's failure to consider the corroborating report of the Plaintiff's husband.  It has long been held that, "[w]hen an ALJ fails to believe lay testimony about a claimant's allegations of pain, he should discuss the testimony specifically and make explicit credibility determinations." Ricketts v. Sec'y of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990), citing Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984)("We have held that a failure to make credibility determinations concerning such evidence requires a reversal and a remand."); see also, Prince v. Bowen, 894 F.2d 283, 286 (8th Cir. 1990); Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984); but, cf., Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)("While it is preferable that the ALJ delineate the specific credibility determinations for each witness, an 'arguable deficiency in opinion-writing technique' does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."), citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  We note the omission in order that it will not be replicated on remand, if our Recommendation is adopted.

- 71 -

RECOMMENDED:

1.     That the Defendant's Motion [Docket No. 16] for Summary Judgment be denied.

2.     That the Plaintiff's Motion [Docket No. 9] for Summary Judgment be denied.

3.     That this matter be remanded to the Commissioner for further proceedings, in accordance with this Report.

4.     That, pursuant to the holding in Shalala v. Schaefer, 509 U.S. 292 (1993), Judgment be entered accordingly.


Dated:  January 28, 2008               *s/Raymond L. Erickson*
                                       Raymond L. Erickson
                                       CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **February 14, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to

comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 14, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.